(115 App. Div. 254.)

PEOPLE ex rel. NEW YORK ELECTRIC LINES CO. v. ELLISON,
Com'r, et al.

(Supreme Court, Appellate Division, First Department. November 5, 1906.)

1. MANDAMUS—MUNICIPAL CORPORATIONS—OFFICERS.

Mandamus to compel commissioner of water supply, gas, and electricity to grant permission to construct subways and conduits under certain streets will not lie where the plans for such subways or conduits were not approved by the board of electrical control or the officers succeeding to the power vested in such board, as required by Laws 1885, p. 852, c. 499, providing for the appointment of a board of commissioners of electrical subways in certain cities, and declaring that no company shall construct any conduits without the approval by such board of the plan submitted to it.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 33, Mandamus, §§ 37, 131, 134.]

2. ELECTRICITY—SUBWAYS—RIGHT TO CONSTRUCT—LAPSE.

Laws 1885, p. 853, c. 499, § 4, provides that, in case no suitable plan for the construction of electrical conduits and subways be proposed or used within 60 days after the passage of the act, the board of commissioners shall have a general plan, meeting the requirements of the act, devised and made ready for use. *Held*, that the right of a corporation, on permission granted by the city council to construct subways, lapsed, where it failed to procure the approval of the board of commissioners of its plan for the construction thereof within 60 days after the passage of the act, and where no attempt was made for more than 20 years to act thereunder, while such subways were being constructed by others pursuant to plans and specifications furnished by the board under contracts with the commissioners, which were approved by the state.

3. CONSTITUTIONAL LAW—OBLIGATION OF CONTRACTS—REQUISITES—ACTS UNDER PERMIT.

The mere granting of permission by a city council to a corporation to construct conduits and subways, where the corporation performs no act thereunder, does not constitute a contract which the Legislature can not revoke.

Appeal from Special Term, New York County.

Mandamus by the people, on the relation of the New York Electric Lines Company, against William B. Ellison, to compel respondent, as commissioner of water supply, gas, and electricity of the city of New York, to grant petitioner a permit to make excavation in certain streets. Application denied (101 N. Y. Supp. 444), and relator appeals. Affirmed.

Argued before O'BRIEN, P. J., and INGRAHAM, CLARKE, HOUGHTON, and SCOTT, JJ.

Alton B. Parker, for appellant.
Theodore Connoly, for respondents.

INGRAHAM, J. The relator was incorporated under the general telegraph act (chapter 265, p. 392, of the laws of 1848), as amended by chapter 471, p. 931, of the Laws of 1853. Upon its incorporation the relator had power to construct lines of telegraph along and upon any of the public roads and highways and across any of the waters within the limits of the state by the erection of the necessary fixtures. By section 2, c. 471, p. 931, of the Laws of 1853, the relator was authorized to erect and construct, from time to time, the necessary fixtures for such lines of telegraph upon, over, or under any of the public roads, streets, and highways. By chapter 483, p. 656, of the

Laws of 1881, the relator was authorized, "from time to time, to construct and lay lines of electrical conductors under ground in any city, village or town within the limits of this state * * * provided that such company shall, before laying any such line in any city, village or town of this state, first obtain from the common council of cities * * * permission to use the streets within such city, village or town for the purposes herein set forth." On April 10, 1883, the board of aldermen of the city of New York passed a resolution "that permission be and hereby is granted to the New York Electric Lines Company to lay wires or other conductors of electricity in and through the streets, avenues and highways of New York City, and to make connections of such wires or conductors under ground by means of the necessary vaults, test-boxes and distributing conduits." Under this authority the relator on July 27, 1886, applied to the commissioner of public works for a permit to make excavations in certain streets in the city of New York for the purposes of laying the wires or other conductors of electricity in and through the streets, villages, and highways of the city of New York. This permission having been refused, an application was made on September 7, 1886, to the Court of Common Pleas of the city of New York for a mandamus requiring the commissioner of public works to grant to the petitioner a permit to make excavations in certain streets in the city of New York for the purpose of laying the wires or conductors of electricity. This application was denied, and the decision of the court was affirmed by the Court of Appeals (107 N. Y. 593, 14 N. E. 820, 1 Am. St. Rep. 893). The permission was refused upon the ground that the relator had not obtained the approval of the board of electrical control of the city of New York to its plans and construction based upon section 1 of chapter 534, p. 647, of the Laws of 1884, and chapter 499, p. 852, of the Laws of 1885. Section 3 of chapter 499, p. 853, of the Laws of 1885, provides that:

"When any company operating or intending to operate electrical conductors in any such city shall desire or be required to place its conductors or any of them under ground * * * it shall be obligatory upon such company to file with the said board of commissioners a map or maps made to scale showing the streets or avenues or other highways which are desired to be used for such purpose, and a general location, dimensions and costs of the underground conduits desired to be constructed. Before any such conduit shall be constructed, it shall be necessary to obtain the approval by said Board of such plans of construction so proposed by such company."

In that proceeding the relator claimed that this law was a violation of the Constitution, as a law impairing the obligation of contracts, but the Court of Appeals refused to sustain that claim, on the ground that it did not purport to deny to the relator any privilege theretofore granted, "but they did require that they should be exercised with due regard to the claims of others and in such a way that they should cease to constitute a public nuisance, and should be enjoyed in such a manner as to inconvenience and endanger the general public as little as possible"; that "such power is preeminently a police power, and it is within the legitimate authority of a Legislature to delegate its exercise to municipal corporations." In closing the discussion, the court said:

"The claim made by the relator in this case would authorize it to tear up the streets of the city at such, times, in such cases, and under such circumstances as it might itself determine, regardless of the public convenience and welfare and the rights of other claimants to the occupation thereof, and place it beyond the reach of all power by the Legislature to regulate the mode and manner of the enjoyment of its right. We do not think such a claim can be sustained. It is neither within the terms of its contract, and, if it were, it is still subject, in the respects mentioned, to the police power of the state."

I have searched this record in vain to find that the relator stands in any different position in relation to its rights to a permit to use the public streets than it did in 1886, when its application for a mandamus was made and denied. From the affidavits upon which this application was made, it appears that there was submitted to the board of electrical control certain plans of the relator. These plans were not approved by the board. On June 30, 1886, the commissioners adopted a resolution in favor of a subway, which should be in the main to conform to certain general requirements; and it would appear that proposals for the construction of subways under the direction of the board were received from the relator and others and referred to the engineer and counsel for the commission. Subsequently, on July 13, 1886, the engineer and counsel reported to the board, and on July 16, 1886, the board accepted the proposal of the Consolidated Telegraph & Electrical Subway Company to build a subway in the streets of the city of New York necessary for the placing of electrical wires under the streets of the city of New York. The president of the relator protested against this contract being given to any company but the relator; and thereafter no application was made to the board of commissioners of electrical subways or to the board of electrical control by the relator for the approval of its plans, or for permission to construct a subway. Immediately after this action of the board; however, the relator commenced the proceeding which has been referred to, a denial of which application was affirmed by the Court of Appeals in 107 N. Y. 593, 14 N. E. 820, 1 Am. St. Rep. 893. Nothing further was done by the relator until December 8, 1905, when a formal application for a permit to open the streets was made to the commissioner of water supply, which was refused, whereupon this proceeding was commenced for a peremptory writ of mandamus, directed to the commissioner of water supply, gas and electricity of the city of New York, requiring him to grant the application of the relator for permission to construct subways or conduits under the surface of certain streets of the city of New York and for a permit to open said streets for the purpose of such construction, and also directed to the president of the borough of Manhattan and the president of the borough of the Bronx, requiring them and each of them to approve the said permit to open the streets in their respective boroughs. A failure of this relator to have the plans approved by the board of electrical control, or the officials who have succeeded to the power vested in such board, as required by chapter 534, p. 647, of the Laws of 1884, and chapter 499, p. 852, of the Laws of 1885, justified the court below in denying this application under the decision of the Court of Appeals in 107 N. Y. 593, 14 N. E. 820, 1 Am. St. Rep. 893.

I think, however, that the relator must fail in his application for

another reason.    Subsequent to the passage of chapter 483, p. 656, of
the Laws of 1881, and on the 14th day of October, 1882, the relator was
incorporated under the general telegraph act (chapter 265, p. 392, of
the Laws of 1848), and on April 10, 1883, under that act obtained
permission from the common council to use the streets, avenues, and
highways of the city of New York.   On June 13, 1885, subsequent to
its incorporation and the permission granted by the common council,
but before the relator had acted under the permission obtained from
the common council, chapter 499, p. 852, of the Laws of 1885 was
passed.    By that act the board of commissioner of electrical subways
was created.    Section 3 (page 853) of that act provided:

"When any company, operating or intending to operate electrical conductors
in any such city, shall desire or be required to place its conductors or any of
them under ground in any of the streets, avenues or other highway of any such
city, and for that purpose to remove the same from the surface thereof, and
shall have been duly authorized to do so, it shall be obligatory upon such com-
pany to file with said board of commissioners a map or maps made to scale,
showing the streets or avenues or other highways which are desired to be
used for such purpose, and giving the general location, dimensions and course
of the underground conduits desired to be constructed.  Before any such con-
duits shall be constructed, it shall be necessary to obtain the approval by said
board of said plan of construction so proposed by said company; and said
board has and shall have power to require that the work of removal and of
constructing every such system of underground conductors shall be done ac-
cording to such plan so approved."

And section 4 provides that in case no suitable plan be proposed
or used within 60 days after the passage of the act it shall be the duty
of such board to cause to be devised and made ready for use such a
general plan as will meet the requirements of said act and of this act,
and the board shall have full authority to compel all companies
operating electric wires to use such subway so prepared in accordance
with the provisions of this act.

This act of 1885 was held constitutional by the Court of Appeals in
107 N. Y. 593, 14 N. E. 820, 1 Am. St. Rep. 893.   The board of electric-
al subway commissioners organized on July 20, 1885, and on August
13, 1885, passed a resolution reciting that the 60 days required by the
act of 1885, by which any company operating or intending to operate
electrical conductors in any such city were required to file with the
board of commissioners a map or plan showing the streets or avenues
or other highways desired to be used for such purposes and the general
location of the underground conduits, had expired, and resolved:

"That every corporation, association or person using or desiring to use any
electrical conductors in the city of New York, do forthwith file with this board
such map or maps and other suitable descriptions as will fully inform this
board concerning the location, courses, termini, spaces, and all other details
and requirements concerning the electrical conductors operated or desired to
be operated by such corporation, association or person in the city of New
York, to the end that this board may be enabled to make due provision for
said conductors in the general plan and subway to be devised as aforesaid, and
which it has full authority to require to be used for all the electrical con-
ductors aforesaid."

On August 13, 1885, the president of the relator and others submitted
plans and documents, which were laid over for future action by the

board. The plans which were submitted by the relator and other companies for the construction of these subways were considered by the board, and on June 30, 1886, the commissioners adopted a resolution which favored a subway which confirmed to certain general requirements, and the engineer of the commission was called upon to report on such date as he had collected regarding such requirements, and all proposals for the construction of subways under the direction of the commissioners were referred to the counsel for the commissioners for his assistance in preparing such report, and on July 13, 1886, the engineer and counsel reported on the plans and specifications. By this report the whole subject of subways was considered. The plans of the relator were rejected, and the plans of a corporation known as the "Consolidated Telegraph & Electrical Subway Company" were accepted, and an agreement was made between the commissioners of electrical subway of the city of New York and the Consolidated Company, which was executed. By that contract the corporation agreed to build, equip, maintain, and operate the subways contemplated as provided for in the contract. Such subways were to be built by the corporation in accordance with the plans and specifications furnished by the board, which subways were at all times to be kept in good repair at the cost of the corporation; that "the spaces in said subways shall be leased by the party of the second part to any authorized company, person, or firm operating or intending to operate electrical conductors in any street, avenue or highway in the city of New York that may apply for the same. * * * If at any time the space in such subways shall not be sufficient for all companies so applying for the same, such space shall be provided as shall be so needed by the party of the second part at its own cost, subject to the approval of the parties of the first part and their successors, as in the original construction. * * * The party of the second part may fix a fair scale of rents to be charged, according to the kind of conductors and the amount of space required, which rents shall be at the same rate to all occupants. * * * In case any dispute shall arise between the party of the second part and any company occupying or desiring or required to occupy said subways, the same shall be referred to the parties of the first part and their successors for settlement, whose decisions shall be final."

On April 7, 1887, there was another contract between the commissioners of electrical subway and the Consolidated Company, which to some extent modified the contract of July 27, 1886, and contained additional provisions to insure the construction of the subway which would accommodate all those using or intending to use the streets of New York for electrical conductors. By this contract it was provided that the parties of the first part (commissioners) agreed to use all lawful means within their power to compel all authorized companies or persons using electrical conductors to comply with the provisions of law and to place their conductors in said subways and to pay a fair rental for the space occupied therein. These two contracts were expressly ratified by chapter 716, p. 928, of the Laws of 1887. Under these contracts thus ratified and other contracts by the board or its

successors, subways have been constructed and maintained in the city of New York until the present time. All corporations desiring to use the streets of the city of New York for electrical conductors have occupied these subways, and there is no allegation that this relator cannot obtain space in these subways for the use of any electrical conductors that it may desire to use.

I think that under these provisions of law and contracts made under legislative authority, and ratified by the legislature, the right of this relator to construct a subway lapsed; it having failed to procure the approval of its plans for the construction of such subway within 60 days after the passage of the act of 1885. The provision of the act which requires all corporations who should construct subways in the streets for the purpose of conducting electrical conductors was police regulation, and a failure of the relator to procure the approval of its plans within the time provided for by the Legislature, and the adoption by the board of a system under the contracts approved by the Legislature, by which subways were constructed for the use of those who desired to use the streets for electrical purposes, was inconsistent with the existence of the right of any corporation or individual to use the streets to construct a subway. There is no allegation that all persons desiring to use subways in the city of New York are not supplied by the existing system. There are careful provisions in the contract between the board of electrical control and the Consolidated Company for supplying all those who desire to use the streets for electrical conductors with space in the subways. The use of the streets in New York for water and gas pipes, sewers, underground railroads, electrical conductors, and surface railroads has grown so in late years that it has become impossible to allow every individual or corporation desiring to use such streets to make such construction in them as they wished, but all use of streets granted to corporations and individuals is necessarily subject to the police power of the state, by which such use can be regulated as the public interests require, and all such grants are necessarily subject to the limited area of the streets and the requirements of the public for other uses than that for any particular purpose for which a grant has been made; and I think that when, under legislative authority, the local officials have caused subways to be constructed in the streets for the use of all those who desire to use the streets for electrical conductors, such provision superseded the right of any existing corporation to construct other subways in the public streets for a similar use for which existing subways had been constructed and maintained. That a right granted more than 20 years ago to construct subways in the public streets, where no attempt has been made to act under it, and where, in the meantime, the public authorities have provided ample means for the use of those desiring such a use as was authorised by this grant, may well be considered as having lapsed, and cannot now be revived, in violation of the rights acquired by others and to the public disadvantage.

Nor do I think there was any contract between the relator and the city of New York which was impaired by this action of the Legislature and the board acting under its authority. To constitute a contract.

between the city of New York and the relator, I think something more must exist than the mere granting to the relator permission to use its streets. No franchise was granted by the city of New York. The franchise, if any, was granted by the state. Undoubtedly, when the consent of the city was given, if that consent had been acted upon and the subways constructed, a property right would have been acquired which the city could not take without compensation; but where, under these statutes, a mere right is given, subject to the consent of the city, the consent of the city itself grants no franchise or creates no contract until it is acted on by the grantee. This consent is spoken of by the learned counsel for the relator as a grant from the city. The statute (chapter 483, p. 656, of the Laws of 1881) provides that:

"Any company or companies organized and incorporated under the laws of this state * * * are hereby authorized, from time to time, to construct and lay lines of electrical conductors under ground in any city," etc., "provided that such company shall, before laying any such line in any city, village or town of this state, first obtain from the common council * * * permission to use the streets within such city, village or town, for the purposes herein set forth."

On April 10, 1883, the board of aldermen of the city of New York passed an ordinance which provided:

"That permission be and hereby is granted to the New York Electric Lines Company to lay wires or other conductors of electricity in and through the streets, avenues and highways of New York City, and to make connections of such wires or conductors under ground by means of the necessary vaults, test boxes and distributing conduits."

The relator gets its right to use the streets from the state. But that right does not accrue until the municipal corporation gives permission. When that permission is once given, then the right is complete. But it cannot be that a municipal corporation, having given its permission, is bound hand and foot, so that the permission can never be revoked, although the corporation neglects to act under it and construct its lines for such a period as would divest a person of real property by adverse possession. All of the elements of a contract are wanting. The relator assumed no obligation whatever in relation to the construction of the subway. All it ever agreed to do was that, when it built the subway, it would comply with the conditions imposed. Until the permission granted was accepted by some act of the corporation under it, I think there was no contract. If the relator had agreed to construct these subways within a specified time, a different question would have been presented; but in all the cases where these grants of franchises have been held irrevocable it was because there was an obligation to construct the thing granted, or the grantee had acted under the grant and had constructed it. In those cases a consideration would be apparent. The relator had not acted under the permission granted by the common council. No subway has been built, and, as I view it, no right was acquired that was not subject to legislative control.

The order should be affirmed, with $50 costs and disbursements. All concur.